Dojo is a small town in the province of Dojo-dong, South Korea.  Next case is Johnny Tolbert v. DOJ, 2015, 3162. Next case is Johnnie Tolbert v. DOJ, 2015, 3162. Good morning, your honors. May it please the court. The key question in this case is whether the penalty of removal is grossly disproportionate to the misconduct that Mr. Tolbert admitted that he committed. Make no mistake, this is egregious misconduct. If I may, I'd like to describe the—to set the stage for the transaction that— I think we know all the facts. It's—and you say it's egregious misconduct. Well, certainly it would be egregious misconduct if he knew he accepted envelopes with $1,000 collectively in them. But I didn't read the lower court's opinion as putting all of that onto him, nor did I necessarily read even the deciding official below as suggesting that he had found or concluded that Mr. Tolbert knew this was money. Right? This was a bribe. I mean, it's awful. But—because Mr. Tolbert claimed he thought it was maybe a Christmas card or something small, and I understood the deciding official to say, well, even if that's what you thought, you're not—you know you can't take a gift—can't accept something at all, period, no matter what it is. You can't even accept a Christmas card. And so I guess I have to say if he accepted a Christmas card, it doesn't seem gross—would you say really egregious or something like that, right? I mean, so— Well, we would disagree with that, Your Honor. If he accepted a Christmas card, it's really, really egregious? The rule is plain. You are not to accept anything from a known associate of an inmate. It's also worth mentioning that Mr. Tolbert thought the envelopes could contain one of two things, either a Christmas card or a gift. And then after Mr. Tolbert talked to Officer Velasco, who informed Mr. Tolbert of a potential setup and said, Ms. Lario may try to give you a gift, Mr. Tolbert said, well, that just happened. And so Mr. Tolbert acknowledged that the envelopes could contain a gift. Where did he say that just happened, especially to Mr. Velasco? Because I don't actually think that you have the facts right about this case. So where did he say that? Where did he say that just happened? Because it's my understanding he said, I need to go speak to the supervisor, the lieutenant in charge. My understanding is he didn't tell Velasco anything about the gift. It was when he went to the supervisor that he told her about the gift. Where did he say that just happened? You're going to represent facts to us. You better have them right. I intend to provide that to you, Your Honor. All right. Just a moment. Mr. Velasco's testimony is at 824, if that helps. I can find that for you, Your Honor. I apologize. I thought I had that at my fingertips. Well, maybe you can continue with your argument and your associate here, your colleague, can find it. But let me ask you, if this was egregious, how could it have been egregious if they kept him in his job for six months? Well, that's an unfortunate fact, Your Honor. But let me provide some context and preface this by saying that it's not in the record. So I can only surmise why they kept him in that position. Two facts that are in the record. For one, after this incident, the bureau placed the inmate, Espinoza, in the special housing unit and then later transferred him. The paralegal who handed Mr. Tolbert the two envelopes only visited that specific inmate. So after this incident, it was highly unlikely that Mr. Tolbert would ever run into Ms. Lario while on duty again. Additionally, in Mr. Tolbert's position as the visiting escort officer, he did not have any contact with the inmates. His job was to escort the visitors into the visiting area after they had already passed through security. It was another officer who brought the inmates into the visiting area and then a fourth officer who searched the inmates after visitation to make sure no contraband got in. How does this answer my question? Well, because it was probably the best place for Mr. Tolbert to be because the agency could keep an eye on him. He did not have any contact with the inmates. The paralegal was no longer coming to the prison. But that's true. You just made the other guy's point and he's not even here. That's true. That actually supports the idea that he shouldn't be fired, right? Because what you just described is no worry, no harm, no foul. Ms. Lario only had contact with this inmate. He's gone. So we can leave this guy in place. There really isn't any more risk. There's nothing to be concerned about. He doesn't have direct contact with the inmates. Well, if all of that is true, then why—he didn't come back to the prison, right? That inmate wasn't sent back. So then why fire him? If he could—if the only concern was Ms. Lario and this particular inmate and they're gone and that justifies keeping him on the job after that and not being worried about him, then why in the world did you fire him? Well, Your Honor, there's no guarantee that Mr. Tolbert would only be in that position for the rest of his career. He moved around the prison.  And so in that position as visiting escort officer, the agency could keep an eye on him and minimize his contact with any inmates. And so, like I said, there was no guarantee that he would be just in that position for the rest of his career. And it's unclear too when the warden decided that he had—that he made the decision that we cannot have this guy be a corrections officer. Yeah, it must not have been made when they gave him a commendation, right? Because in between the time when this happened and then the time when he was finally removed, he actually received a commendation from his supervisors, right? So it must be that the warden didn't decide on that day, the day he got a commendation, that he can't be doing this job anymore. That might—that must not have been the day that he made the decision. Well, that commendation covers time before the incident as well. And there's—we're not disputing that Mr. Tolbert was a good corrections officer. It's just this one incident overshadowed that in the warden's eyes. And the commendation came after this one incident, correct? The commendation was issued after the incident. And it covered the time period which included the incident? It would appear to, yes. Yeah, so his conduct was so egregious, and yet we gave him a commendation for a period of time during his work which included the egregious conduct. The one incident, correct. Was the commendation for general performance or for another specific performance? It's just a general commendation, Your Honor. If I can point you to it, it is—I believe the one that Mr. Tolbert was referring to is at A396 of your record. It's for your dedication and hard work at the Federal Detention Center in Miami, Florida. You are greatly appreciated. It's A396. The quote for that just happened. I see it at A62. There's a trial hearing transcript page at 188, line 10, where Tolbert is testifying. On examination. Yes, thank you, Your Honor. So, in Mr. Tolbert's own words, Mr. Velasquez— Can you just tell us—you know, he seemed to be a highly regarded employee for a very long time, and it seems like he's got one blemish. Obviously, the Bureau believed that was a very serious blemish. Can you describe why his taking this envelope, this unknown envelope, so corrupted him for the rest of his career that he had to be terminated? I would defer to the warden's analysis on that or refer the court to the ward's analysis. Can you present that and translate it for us on why we should understand that this is, I don't know, some type of cardinal sin? Sure. It's the risk of compromise. It's the risk that if you do it once, your integrity has been compromised, and you may do it again unless we take care of this situation. The warden made that determination. He had 29 years of experience. The warden did. He's seen this before, seen this type of situation before. In his considered judgment, Mr. Tolbert had been compromised and could not be trusted to perform his job as a corrections officer. Anything further, counsel? If the court has no further questions, we would just ask the court to affirm the arbitrator's decision for the reasons discussed today. Thank you very much. We'll take the case under review. Thank you.